IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

JERAMIAH CHAMBERLAIN,  )
   Plaintiff,     )  Case No. 7:19-cv-00879
         )
v.          )
         )  By: Michael F. Urbanski
DR. T. MATHENA, et al.,   )  Chief United States District Judge
   Defendant.    )

## MEMORANDUM OPINION

Jeramiah Chamberlain, a former Virginia inmate proceeding pro se, filed this action against three physicians employed by the Virginia Department of Corrections, asserting claims under 42 U.S.C. § 1983 and Virginia law. The case is presently before the court on the motion to dismiss filed by Dr. Mark Amonette, ECF No. 40, and the motion for summary judgment filed by Dr. T. Mathena and Dr. Kevin Fox, ECF No. 48. For the reasons set forth below, the motions are **GRANTED** as to Chamberlain's claims under § 1983, and the court declines to exercise supplemental jurisdiction over the state constitutional and tort claims.

## I. Factual Background

### A. Chamberlain's Verified Amended Complaint

In his verified amended complaint, filed on April 5, 2021, Chamberlain alleges that he sustained a gunshot wound to his right forearm on May 8, 2011. Am. Compl. ¶¶ 10, 20, ECF No. 37. He underwent multiple surgeries to repair the arm "as best as medically possible." Id. ¶ 11. He continues to suffer from constant pain as a result of the injury, and the "consistent medical opinion [is] that nothing more can be done, other than to manage the pain." Id. ¶¶ 11, 21.

After Chamberlain entered into the custody of the Virginia Department of Corrections ("VDOC"), his health care providers tried a number of "'formulary' medications and treatments per the recommendations of the [VDOC's] Health Services Director[] and defendant Dr. Mark Amonette." Id. ¶ 22. Chamberlain alleges that he suffered adverse reactions to some of the medications and that others were completely ineffective. Id. As a result, he underwent "multiple medical specialist consults and evaluations by a nerve specialist and a pain management specialist." Id.

In 2015, while Chamberlain was incarcerated at River North Correctional Center ("River North"), Dr. J. Stevens came up with an effective treatment for Chamberlain's pain, which was approved by Dr. Amonette. Id. ¶ 23. In particular, Dr. Stevens prescribed Flexeril (cyclobenzaprine), Neurontin (gabapentin), and Ultram (tramadol).[1] Id. Over the next few years, various physicians, including Dr. Kevin Fox, adjusted or altered this prescription regimen. Id. ¶¶ 26–29. However, in March 2018, a pain management specialist recommended that Chamberlain "be returned to both his original medications and dosages." Id. ¶ 29. Dr. Stevens submitted the list of recommended medications and dosages to Dr. Amonette for approval, and Chamberlain immediately began receiving the medications. Id. Chamberlain alleges that the prescribed medications "made his pain tolerable" and "did not need adjusting." Id. ¶ 31.

The actions at issue in this case began in December 2018, after Chamberlain's prescription for Flexeril expired. Id. ¶ 36. When Chamberlain sought to have the prescription

---

[1] Flexeril (cyclobenzaprine) is a skeletal muscle relaxant; Neurontin (gabapentin) is an anticonvulsant; and Ultram (tramadol) is an opiate (narcotic) analgesic. See U.S. National Library of Medicine: MedlinePlus, https://medlineplus.gov/druginfo/meds (last visited Mar. 29, 2022).

renewed, he was scheduled to be seen by Dr. Stevens's replacement, Dr. T. Mathena. Id. During a subsequent examination on January 4, 2019, Dr. Mathena advised Chamberlain that some of his prescribed medications were not allowed at the correctional facilities where Dr. Mathena had previously worked and that he would instead prescribe "amitriptyline, nortriptyline, and Cymbalta" for Chamberlain.[2] Id. ¶ 37. Chamberlain alleges that he told Dr. Mathena that he had previously experienced adverse side effects from those medications. Id. Nonetheless, Dr. Mathena would not change his mind or permit Chamberlain to be "weaned off of the gabapentin and tramadol." Id. ¶¶ 38–39.

Over the next two days, Chamberlain began to experience withdrawal symptoms, including vomiting, diarrhea, muscle spasms, cramps, insomnia, chills, and sweats, in addition to increased pain. Id. ¶ 40. The withdrawal symptoms lasted for several days. Id. ¶ 59.

Chamberlain was subsequently transferred to Red Onion State Prison ("Red Onion"), where he was placed under the care of Dr. Kevin Fox. Id. ¶ 47. Like Dr. Mathena, Dr. Fox advised Chamberlain "that he would not be given any of his previous medications." Id. ¶ 48. Chamberlain further alleges that Dr. Fox informed him that he would not be seen by a nerve specialist or a pain management specialist. Id. Chamberlain alleges that Dr. Amonette supervises Dr. Mathena and Dr. Fox, and that he "approved all of the above actions." Id. ¶¶ 80, 123.

---

[2] Amitriptyline and nortriptyline are tricyclic antidepressants used to treat neuralgia. See U.S. National Library of Medicine: MedlinePlus, https://medlineplus.gov/druginfo/meds (last visited Mar. 29, 2022). Cymbalta (duloxetine), which is prescribed for ongoing bone and muscle pain, is in a class of medications referred to as selective serotonin and norepinephrine reuptake inhibitors (SNRIs). Id.

### B.    Dr. Mathena and Dr. Fox's Evidence

In support of their motion for summary judgment, Dr. Mathena and Dr. Fox submitted their own declarations, along with VDOC medical records and other exhibits. Dr. Mathena's declaration indicates that he examined Chamberlain on January 4, 2019, as part of a chronic care visit to address Chamberlain's longstanding hepatitis C infection. See Mathena Decl., ECF No. 49-1, at ¶ 3. During the visit, Chamberlain claimed to be experiencing severe pain in his right arm. Id. ¶¶ 3–4. They "discussed Chamberlain's prior pain management for a complex regional pain syndrome (CRPS) associated with his prior gunshot wound," and Chamberlain informed Dr. Mathena that his pain was controlled by a combination of Ultram and Neurontin. Id. ¶ 4. However, based on Chamberlain's "clinical presentation and [a] medical literature search," Dr. Mathena declined to prescribe Ultram and Neurontin, and instead proposed alternative medications to control Chamberlain's pain. Id. ¶ 11.

Dr. Mathena's declaration provides the following explanation for his decision:

> In my medical judgment, Chamberlain suffered from chronic pain at the site of his prior gunshot wound. My training and experience indicated that the combination of Ultram and Neurontin would not be indicated for his chronic pain. Moreover, the sedative effects of these controlled substances in combination presented a safety risk for Chamberlain if he were to continue taking both drugs at the doses he desired.
>
> Since his original prescriptions had been started, the medical evidence began to demonstrate there was a significant risk of abuse associated with Neurontin alone and in combination with Ultram. Neurontin became a controlled substance,[3] and as a physician, I do not generally prescribe it for chronic pain. I

---

[3] Neurontin (gabapentin) is classified as a controlled substance in Virginia. See Va. Code Ann. § 54.1-3454. Ultram (tramadol) is a Schedule IV controlled substance under federal law. See United States v. Hasson, 26 F.4th 610, 612 (4th Cir. 2022) (noting that the defendant was charged with unlawfully possessing tramadol, "an opioid pain reliever and Schedule IV controlled substance").

believe other medications are more effective at controlling chronic pain with less side effects and fewer risks to patients.

In addition to using my experience as a physician, I consulted UpToDate (a medical literature resource) to evaluate what the current medical literature showed for how or if these drugs were being used to treat chronic pain. My research showed these drugs were not indicated for chronic pain due to complex regional pain syndrome.

I considered if Chamberlain was experiencing acute pain during our visit, but he did not appear to be in distress or any pain at that time. Moreover, he admitted that he had recently tattooed the area in question. I could see the tattoo directly over the scarred area from his prior gunshot wound. In my medical experience, patients with extreme chronic or acute pain would not obtain a tattoo on a painful area. It simply hurts too much to consider having a tattoo placed there. The presence of a recent tattoo on the location where he claimed to have pain was objective clinical evidence that his subjective claims of pain may not be accurate or were otherwise being overstated.

I evaluated his arm for other injuries and did not find anything of significance. He did not show any objective evidence of neurologic deficits and did not appear in distress.

Chamberlain had a history of drug diversion and abuse of these controlled substances, and Ultram and Neurontin have been subject to drug diversion and abuse in prisons. In my judgment, there was a significant risk that Chamberlain was not taking these medications as directed but was instead diverting or otherwise abusing them.

In view of his clinical presentation and my medical literature search, I proposed alternative medications to control Chamberlain's pain that were better suited to this chronic condition. I offered him several treatment choices including Elavil, Cymbalta, specialist consults or additional nerve blocks. These drugs are effective in controlling pain but do not have the euphoria Neurontin provides which makes them less subject to abuse or diversion. These were better therapeutics with less side effects to manage his chronic pain. He refused these treatments.

Id. ¶¶ 5–11.

5

Dr. Mathena's declaration also addresses Chamberlain's contention that he should have slowly reduced the amount of Ultram and Neurontin prescribed for Chamberlain rather than abruptly ending the prescriptions. Dr. Mathena maintains that, in his experience, "cessation of this drug combination can be uncomfortable for a day or two, but it does not carry a risk of significant . . . permanent injury." Id. ¶ 15. Dr. Mathena further asserts that although he did not believe that Chamberlain was taking the prescribed medications as directed, he "anticipated Chamberlain would have mild symptoms associated with stopping the Neurontin even if he had been taking it as directed before [the] office visit." Id. Dr. Mathena notes that Chamberlain could have submitted a sick call request if his symptoms were bothersome and that, to his knowledge, Chamberlain never submitted a sick call request related to any alleged withdrawal symptoms. Id. ¶¶ 15–16. Dr. Mathena also notes that Chamberlain could have scheduled a follow-up visit to address his chronic pain condition at any point following the January 2019 visit. Id. ¶ 18. Dr. Mathena asserts, upon information and belief, that Chamberlain did not ask to be reevaluated during his remaining time at River North. Id.

Dr. Mathena's declaration is accompanied by a copy of an email that he sent to Dr. Amonette on January 4, 2019, after Chamberlain's chronic care visit. The email states as follows:

> Today I saw Mr. Chamberlain (1094343) in clinic. We discussed pain management of his CRPS of the RUE secondary to GSW in 2011.
>
> I reviewed the notes from pain management and their recommendations re ultram and neurontin a few months ago. He has had several nerve block attempts apparently with only mild success.

6

He claims that the current medication regimen is only partially controlling his pain and requesting a refill on flexeril as well.

On exam he has a fresh appearing tattoo nearly completely covering the affected area of his right upper extremity. He admitted to me and the staff that he had gotten this "about six months ago."

Otherwise he does have some atrophy of the forearm muscles, but this appears chronic. He has no tremors nor any acute neurologic deficits appreciable. He appears in absolutely no distress on examination.

In light of his recent tattooing directly on the site of supposed extreme pain, and his history of abuse and diversion of medication in the past, I have discontinued his ultram and neurontin. My review of the literature (uptodate) shows no indication for ultram and states that the only RCT for neurontin in treatment of CRPS showed no benefit.

I offered him other treatment such as elavil, etc… but he refuses them all. He is still interested in nerve blocks which I am hoping pain management can continue to facilitate. I am going to have the nurse send a copy of my notes to them as well so they are aware of the situation.

Mathena Decl. Ex., ECF No. 49-1, at 12. In a response email dated January 7, 2019, Dr. Amonette wrote that he agreed with Dr. Mathena's approach. Id. at 13.

Dr. Fox's declaration indicates that he examined Chamberlain on December 6, 2019, after Chamberlain was transferred to Red Onion. Fox Decl. ¶ 5, ECF No. 49-2. During the examination, Chamberlain complained of severe pain in his right arm near the location of the prior gunshot wound. Id. ¶ 7. Based on his examination of Chamberlain and his review of available medical records, Dr. Fox "proposed alternative medications to control Chamberlain's pain" that he believed were "better suited to his chronic condition," including Cymbalta, Elavil (amitriptyline), and nortriptyline. Id. ¶¶ 10–16. Dr. Fox states that he "declined to restart

[Chamberlain's] desired combination of Ultram with Neurontin because the alternatives [Dr. Fox] proposed are effective in controlling pain but do not have the euphoria Neurontin provides which makes them less subject to abuse or diversion." Id. ¶ 17. Dr. Fox asserts that, in his opinion, Cymbalta, Elavil, and nortriptyline "were better therapeutics with less side effect to manage [Chamberlain's] chronic pain." Id. However, Chamberlain "refused these alternative medications." Id.

Dr. Fox saw Chamberlain again on April 16, 2021. Id. ¶ 20. According to Dr. Fox, Chamberlain "moved all extremities smoothly and did not exhibit signs or symptoms of discomfort." Id. When Chamberlain "demanded Neurontin, Ultram, and Buprenorphine," Dr. Fox "discussed other options with him, including Cymbalta and Elavil." Id. However, Chamberlain "refused the alternatives." Id. Chamberlain also reported that psychiatry had given him Naltrexone, which helps prevent relapse into drug abuse, and that "he then went into withdrawal, because he continues to regularly abuse and divert Buprenorphine, an opioid." Id. Based on their discussion, Dr. Fox "placed a QMC for interventional pain management as [Chamberlain] indicated some willingness to try Ziconotide." Id. At the time of Dr. Fox's declaration, Dr. Amonette had "approved the QMC for interventional pain management" and Dr. Fox was "awaiting a response from interventional pain management," which is not available on site at Red Onion. Id. ¶ 21.

## C.   Chamberlain's Response in Opposition to Summary Judgment

On July 29, 2021, Chamberlain filed a verified response in opposition to the motion for summary judgment, in which he incorporates affidavits that were previously filed in the case, including an affidavit executed on January 29, 2021. In that affidavit, Chamberlain denies

having abused the pain medications that he was originally prescribed and asserts that he previously experienced "horrible adverse reactions" from the alternative medications proposed by Dr. Mathena and Dr. Fox. Chamberlain Aff., ECF No. 32-2, at ¶¶ 8, 12. Chamberlain further asserts that he "went through horrible withdrawal" after Dr. Mathena "took away [his] effective medications." Id. ¶ 11. Chamberlain also asserts that "Dr. Fox maintains the same attitude as Mathena" and refuses to prescribe anything other than amitriptyline, nortriptyline, or Cymbalta, even though Chamberlain has explained that the medications are ineffective and trigger side effects. Id. ¶ 15. Chamberlain claims that "Dr. Fox, like Mathena, also refuses to allow [Chamberlain] access to the specialists [he] was being treated by." Id. ¶ 17.

Chamberlain's response is accompanied by various medical records from the VDOC and outside providers. The VDOC records include a consultation request from June 2014, in which the requesting physician noted that Chamberlain was currently taking Neurontin and Tylenol, that he was "allergic to a number of NSAIDs," and that Chamberlain had reported that "[n]othing [had] helped [his] 'bone pain.'" Pl.'s Resp. Opp'n Attach. A, ECF No. 71-2, at 2. The VDOC records also include a psychiatry progress note from May 2020, which reflects that Chamberlain has a history of opioid dependence, that he requested an "opioid replacement for opioid use disorder," and that he reported being unable to tolerate SNRIs or SSRIs. Id. at 22. Records from VCU Health indicate that Chamberlain is allergic to Ibuprofen, Mobic, penicillin, and "sulfa drugs," and that he reported experiencing side effects after taking amitriptyline (Elavil). Id. at 4, 10, 14.

Chamberlain also submitted exhibits containing drug information for tramadol and Neurontin. See Pl.'s Resp. Opp'n Attach. B., ECF No. 71-2, and 23–97. The first exhibit, from MedlinePlus, indicates that tramadol (Ultram) "may be habit forming, especially with prolonged use"; that there is a greater risk of overuse by patients who have a history of drug, alcohol, or prescription medication abuse; that patients should "not stop taking tramadol without talking to [their] doctor"; and that they "may experience withdrawal symptoms" if they "suddenly stop taking tramadol." Id. at 23, 25. The second exhibit includes a medication guide for Neurontin (gabapentin), which includes the following warning: "Do not stop taking NEURONTIN without first talking to a healthcare provider . . . . Stopping NEURONTIN suddenly can cause serious problems. Stopping a seizure medicine suddenly in a patient who has epilepsy can cause seizures that will not stop (status epilepticus)." Id. at 93.

### D.    Dr. Mathena and Dr. Fox's Reply

On August 20, 2021, Dr. Mathena and Dr. Fox filed a reply brief in support of their motion for summary judgment, along with a second declaration from Dr. Fox and other exhibits. In the second declaration, Dr. Fox states that he has reviewed Chamberlain's medical records in the possession of the VDOC and that "[t]here is no record of Chamberlain ever taking Cymbalta in the past, much less reporting any allergic reactions or other negative side effects from Cymbalta." Fox 2d Decl., ECF No. 81-2, at ¶¶ 2–3. Dr. Fox also asserts that "[t]here is no objective evidence in Chamberlain's medical records corroborating [his] reported allergy to SSRIs or SNRIs . . . ." Id. ¶ 5. Dr. Fox continues to offer the opinion that "Cymbalta would provide Chamberlain relief for his pain symptoms." Id. ¶ 7.

10

## II.   Procedural History

Chamberlain originally brought this action against Dr. Mathena, Dr. Fox, and Dr. Amonette on December 26, 2019. On April 5, 2021, Chamberlain filed an amended complaint against the defendants. In the amended complaint, Chamberlain seeks relief under 42 U.S.C. § 1983 for alleged violations of his Eighth Amendment right to adequate medical treatment (Count I) and his right to equal protection under the Fourteenth Amendment (Count II). Chamberlain also asserts several claims under state law, including claims of medical malpractice and intentional infliction of emotional distress (Counts III through VII).

On April 15, 2021, Dr. Amonette moved to dismiss the claims against him under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On May 14, 2021, Dr. Mathena and Dr. Fox moved for summary judgment under Rule 56. The case was transferred to the undersigned on August 10, 2021. The defendants' motions have been fully briefed and are ripe for disposition.

## III.   Standards of Review

Under Rule 12(b)(6), a defendant may move to dismiss a complaint for failure to state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. While a complaint does not need "detailed factual allegations," merely offering "labels and conclusions," "naked assertion[s] devoid of further factual enhancement," or "a formulaic recitation of the elements of a cause of action

11

will not do." Id. (alteration in original) (internal quotation marks omitted) (quoting Twombly, 550 U.S. at 555, 557).

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson, 477 U.S. at 248–49). When ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Tolan v. Cotton, 572 U.S. 650, 657 (2014). To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. Anderson, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks and citation omitted).

## IV.    Discussion

### A.    Claims under § 1983

"Section 1983 authorizes a plaintiff to sue for an alleged deprivation of a federal constitutional right by an official acting under color of state law." Williamson v. Stirling, 912 F.3d 154, 171 (4th Cir. 2018) (internal quotation marks and citations omitted). In order for an official to be held liable under § 1983, the plaintiff must affirmatively show that the official

"acted personally in the deprivation of the plaintiff's rights." Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (internal quotation marks and citation omitted). "That is, the official's 'own individual actions' must have 'violated the Constitution.'" Williamson, 912 F.3d at 171 (quoting Ashcroft, 556 U.S. at 676).

### 1. Eighth Amendment Claims

In Count I of the amended complaint, Chamberlain claims that Dr. Mathena, Dr. Fox, and Dr. Amonette violated his rights under the Eighth Amendment. "The Eighth Amendment, which is applicable to the States through the Fourteenth Amendment, prohibits the infliction of 'cruel and unusual punishments.'" Anderson v. Kingsley, 877 F.3d 539, 543 (4th Cir. 2017) (quoting U.S. Const. amend. VIII). "Under the Eighth Amendment, prisoners have the right to receive adequate medical care while incarcerated." DePaola v. Clarke, 884 F.3d 481, 486 (4th Cir. 2018) (citing Scinto v. Stansberry, 841 F.3d 219, 236 (4th Cir. 2016)). An Eighth Amendment violation occurs when a prison official "demonstrates 'deliberate indifference' to an inmate's serious medical needs." Id. (citations omitted); see also Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) ("A prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.").

A claim for deliberate indifference has two components. Heyer v. United States Bureau of Prisons, 849 F.3d 202, 209 (4th Cir. 2017). "The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry." Id. In this case, the defendants do

not challenge whether Chamberlain's medical needs were objectively serious. Instead, their arguments are directed to the subjective component of deliberate indifference.

The United States Court of Appeals for the Fourth Circuit has explained that "[a]n official is deliberately indifferent to an inmate's serious medical needs only when he or she subjectively 'knows of and disregards an excessive risk to inmate health or safety.'" Jackson, 775 F.3d at 178 (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). This standard is "exacting," and it requires more than "mere negligence or even civil recklessness." Id. (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)). To rise to the level of an Eighth Amendment violation, "it is not enough that an official should have known of a risk." Id. Rather, the official "must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Id. "The subjective component therefore sets a particularly high bar to recovery." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). To find a defendant liable, "the treatment given must be 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" Hixson v. Moran, 1 F.4th 297, 303 (4th Cir. 2021) (quoting Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990)).

a.      **Dr. Mathena and Dr. Fox**

The court will first address Chamberlain's Eighth Amendment claims against the treating physicians, Dr. Mathena and Dr. Fox. For the following reasons, the court concludes that both physicians are entitled to summary judgment.

First, there is insufficient evidence from which a reasonable jury could find that Dr. Mathena acted with deliberate indifference by discontinuing Chamberlain's prescriptions for

Ultram and Neurontin, and instead offering alternative medications such as Cymbalta and Elavil. The record establishes that Dr. Mathena exercised medical judgment in deciding to discontinue the prescriptions and that his decision was based on multiple factors, including the following: (1) his own physical examination findings; (2) the safety risks posed by taking Ultram and Neurontin at the doses desired by Chamberlain; (3) evolving medical evidence regarding the risk of abuse associated with Ultram and Neurontin; (4) Chamberlain's history of drug abuse and the possibility that he was not taking the medications as directed; and (5) Dr. Mathena's opinion that other drugs, such as Cymbalta and Elavil, would effectively control Chamberlain's pain with fewer side effects and less potential for abuse. While Chamberlain obviously disagrees with Dr. Mathena's treatment decisions, the Fourth Circuit has "consistently found such disagreements [between an inmate and a physician over the inmate's proper medical care] to fall short of showing deliberate indifference." Jackson, 775 F.3d at 178; see also Drakeford v. Mullins, 678 F. App'x 185, 186 (4th Cir. 2017) ("To the extent Drakeford complains that additional, stronger, or more frequent pain medication was required, this, without more, is insufficient to prevail on a deliberate indifference claim."); Branham v. Meyer, No. 4:19-cv-00279, 2019 U.S. Dist. LEXIS 195814, at *10 (D.S.C. Nov. 12, 2019), aff'd, No. 20-6035, 2020 U.S. App. LEXIS 23171 (4th Cir. July 23, 2020) ("Refusing Branham access to Ultram, the prescription of his choice, does not rise to the level of deliberate indifference . . . ."); Mohammed v. Daniels, No. 5:13-cv-03077, 2016 U.S. Dist. LEXIS 117201, at *39 (E.D.N.C. Aug. 31, 2016), aff'd, No. 16-7364, 2017 U.S. App. LEXIS 1049 (4th Cir. Jan. 20, 2017) ("Plaintiff's disagreement with Owens' decision with respect to plaintiff's pain management does not rise to a level of deliberate indifference.").

Second, no reasonable jury could find that Dr. Mathena insisted on a course of treatment that he knew would be ineffective or unsafe. See Goodloe v. Sood, 947 F.3d 1026, 1031 (7th Cir. 2020) (noting that "a prison official cannot doggedly persist in a course of treatment known to be ineffective without violating the Eighth Amendment"). Although Chamberlain claims that he told Dr. Mathena that he had previously experienced adverse side effects from taking other pain medications, there is no documentary evidence of Chamberlain ever being prescribed Cymbalta in the past, much less experiencing negative side effects from Cymbalta. Nor is there any objective evidence indicating that Cymbalta or Elavil would pose significant risks to Chamberlain's health. Therefore, the fact that Dr. Mathena offered to prescribe Cymbalta or Elavil, despite Chamberlain's self-reported history of intolerances, is not sufficient to establish deliberate indifference. See, e.g., Leiser v. Hoffman, No. 3:18-cv-00277, 2020 U.S. Dist. LEXIS 163293, at *36 (W.D. Wis. Sept. 8, 2020), aff'd, No. 20-2908, 2021 U.S. App. LEXIS 21243 (7th Cir. July 19, 2021) (holding that a plaintiff's subjective assertion that naproxen had not worked for him in the past would not allow a reasonable jury to find that the defendant acted with deliberate indifference by "dec[iding] to give naproxen a try and see for himself whether it worked for [the plaintiff]"). Likewise, the fact that other physicians declined to prescribe Cymbalta or Elavil to treat Chamberlain's pain suggests, at most, that physicians may disagree about what the proper course of treatment is for Chamberlain. "However, a disagreement among reasonable medical professionals is not sufficient to sustain a deliberate indifference claim." Hixson, 1 F.4th at 303; see also Jackson, 775 F.3d at 178 (holding that the fact that the defendant, "who is not a heart specialist, . . .

substantially modified the medication regimen prescribed by [the plaintiff's] cardiologist" did not support a claim of deliberate indifference) (internal quotation marks and citation omitted).

For similar reasons, the court concludes that Chamberlain has failed to present evidence sufficient to establish that the failure to taper his prescriptions for Ultram and Neurontin was "so grossly incompetent" as to permit a finding of deliberate indifference. Hixson, 1 F.4th at 303. Although the drug information cited by Chamberlain indicates that patients should not stop taking Ultram or Neurontin without talking to a doctor and that suddenly stopping Neurontin can cause serious problems for some patients, it does not suggest that all patients will experience severe symptoms of withdrawal or that either medication should never be immediately discontinued. To the extent that Dr. Mathena mistakenly believed that Chamberlain would only experience mild symptoms from stopping the medications, "that mistaken belief [regarding the risk for withdrawal symptoms] is not enough to support an Eighth Amendment claim." Dillard v. Ashraf, No. 1:18-cv-00094, 2020 U.S. Dist. LEXIS 94843, at *11 (D. Md. June 1, 2020); see also Leiser, 2020 U.S. Dist. LEXIS 163293, at *42–43 ("Although Leiser claims that Dr. Hoffman's conclusion ignored the recommendations from the FDA, Leiser has not submitted any evidence that calls into question Dr. Hoffman's judgment call related to Leiser's particular dose of tramadol, much less evidence that suggests that any dose of tramadol cannot be immediately discontinued. Even assuming, arguendo, that Dr. Hoffman's conclusion about the possibility of withdrawal symptoms was wrong, this would at most constitute negligence . . . .").

Additionally, for the same reasons explained above with respect to Dr. Mathena, Chamberlain has not pointed to evidence from which a reasonable jury could find that Dr.

Fox acted with deliberate indifference by declining to prescribe Ultram and Neurontin, and instead offering alternative medications such as Cymbalta and Elavil. Dr. Fox's declarations set forth the reasons for this clinical decision, including the risk of abuse associated with Neurontin and Ultram, Chamberlain's own history of drug abuse,[4] the fact that Chamberlain's pain was chronic rather than acute, and Dr. Fox's own belief that "other medications are more effective at controlling chronic pain with less side effects and risks to the patient." Fox Decl. ¶¶ 7–9; see also Fox 2d Decl. ¶ 7. While Chamberlain obviously disagrees with the course of treatment offered by Dr. Fox, such disagreement falls short of showing deliberate indifference, as does the fact that other physicians previously found the medication regimen requested by Chamberlain to be appropriate. Jackson, 775 F.3d at 178–79. In short, no reasonable jury could find that Dr. Fox "subjectively kn[ew] of and disregard[ed] an excessive risk" to Chamberlain's health or safety by offering to prescribe Cymbalta or Elavil instead of Ultram and Neurontin. Id.

Finally, the court concludes that the physicians' purported refusal to immediately refer Chamberlain to a specialist does not rise to the level of a constitutional violation. Chamberlain's allegations in this regard "at most suggest negligence, rather than deliberate indifference." Jones v. Cuddy, No. 14-5087, 2014 U.S. App. LEXIS 24824, at *4 (6th Cir. 2014) (citing Reilly v. Vadlamudi, 680 F.3d 617, 625 (6th Cir. 2012)); see also Self v. Crum, 439 F.3d 1227, 1232 (10th Cir. 2006) (explaining that "the subjective component [of deliberate indifference] is not satisfied, absent an extraordinary degree of neglect, where a doctor merely

---

[4] Although Chamberlain denies having previously abused Ultram or Neurontin, one of his own exhibits indicates that he has a history of opioid dependence and that he has been diagnosed with opioid use disorder. See Pl.'s Resp. Opp'n Attach. A, ECF No. 71-2 at 22.

exercises his considered medical judgment" and that "[m]atters that traditionally fall within the scope of medical judgment are such decisions as whether to consult a specialist or undertake additional medical testing").

For these reasons, the court concludes that Dr. Mathena and Dr. Fox are entitled to summary judgment on the claims of inadequate medical treatment in violation of the Eighth Amendment. Although Chamberlain has a long history of chronic pain resulting from his gunshot wound, the court is convinced that no reasonable jury could find that the physicians' actions exhibited deliberate indifference to his serious medical needs.

### b.   Dr. Amonette

The court likewise concludes that Chamberlain has failed to state a viable Eighth Amendment claim against Dr. Amonette. It is clear from the amended complaint that Dr. Amonette did not personally treat Chamberlain at River North or Red Onion. Instead, Chamberlain seeks to hold Dr. Amonette responsible for approving the decision to discontinue his prescriptions for Neurontin and Ultram. However, the amended complaint is devoid of facts from which the court could reasonably infer that Dr. Amonette knew that the discontinuation of the existing prescriptions would pose a serious risk of harm to Chamberlain or that Dr. Amonette disregarded such risk. See Jackson, 775 F.3d at 178. Nor does it plausibly allege that Dr. Amonette knew that prescribing Cymbalta or Elavil posed an excessive risk of harm to Chamberlain. Id. Consequently, to the extent Chamberlain seeks to hold Dr. Amonette personally responsible for the changes made to his prescription regimen, the amended complaint fails to state a claim upon which relief may be granted.

To the extent Chamberlain seeks to impose liability against Dr. Amonette on the basis that he supervises Dr. Mathena and Dr. Fox, his claim fares no better. The mere fact that Dr. Amonette is a medical supervisor or administrator does not provide a basis for liability under § 1983. See Revene v. Charles Cnty. Comm'rs, 882 F.2d 870, 874 (4th Cir. 1989) (noting that "there is no vicarious liability under § 1983") (citing Vinnedge v. Gibbs, 550 F.2d 926, 928–29 (4th Cir. 1977)). Under existing precedent, a supervisory official can only be held liable for the actions or inactions of a subordinate under certain "limited" circumstances. King v. Rubenstein, 825 F.3d 206, 223 (4th Cir. 2016). Specifically, to establish supervisory liability under § 1983, a plaintiff must show: (1) that the defendant "had actual or constructive knowledge that [a] subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the defendant's "response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices'"; and (3) that there was an "affirmative causal link" between the defendant's conduct and the alleged constitutional injury. Wilkins v. Montgomery, 751 F.3d 214, 226 (4th Cir. 2014) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)).

Chamberlain has not alleged facts sufficient to satisfy these elements. Among other deficiencies, there are no allegations from which the court could reasonably infer that Dr. Amonette knew or should have known that Dr. Mathena or Dr. Fox was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury. Id. Nor does the amended complaint include facts sufficient to show that Dr. Amonette acted with deliberate indifference to a pervasive risk of harm. See Shaw, 13 F.3d at 799 (explaining that "[a] plaintiff

may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses" but may not do so by merely "pointing to a single incident or isolated incidents") (internal quotation marks and citation omitted). In short, Chamberlain's disagreement with the treatment decisions made by Dr. Mathena and Dr. Fox is insufficient to show deliberate indifference on the part of Dr. Amonette. Jackson, 775 F.3d at 178. Accordingly, the court concludes that the Eighth Amendment claim against Dr. Amonette is subject to dismissal under Rule 12(b)(6).[5]

## 2.    Equal Protection Claim

In Count II of the amended complaint, Chamberlain claims that the defendants violated his right to equal protection by discontinuing his prescriptions for Ultram and Neurontin. The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To state an equal protection claim, "a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." Equity in Athletics, Inc. v. Dep't of Educ., 639 F.3d 91, 108 (4th Cir. 2011); see also Fauconier v. Clarke, 966 F.3d 265, 277 (4th Cir. 2020).

The court agrees with the defendants that the factual allegations in Chamberlain's amended complaint are insufficient to satisfy either of these elements. With respect to the first

---

[5] The court also notes that "[t]here can be no supervisory liability when there is no underlying violation of the Constitution." Doe v. Rosa, 664 F. App'x 301, 304 (4th Cir. 2016). For the reasons set forth above, the court concludes that no reasonable jury could find that Dr. Amonette's subordinates violated Chamberlain's rights under the Eighth Amendment. This conclusion is "fatal" to Chamberlain's supervisory liability claim against Dr. Amonette. Id.

element, Chamberlain has not plausibly alleged that he was treated less favorably than "persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992). His conclusory assertion that "other VDOC offenders" are receiving Ultram or Neurontin for chronic pain simply does not suffice. See, e.g., Riley v. Roycroft, No. 7:16-cv-02227, 2017 U.S. Dist. LEXIS 28393, at *21 (S.D.N.Y. Feb. 28, 2017) (holding that the plaintiff failed to allege facts sufficient to demonstrate a substantial similarity between himself and other inmates where he merely asserted, in conclusory fashion, that he "was not given the medication Ultram while Ultram was provided to other inmates with the same medical condition"). Likewise, Chamberlain's conclusory assertion of intentional discrimination on the part of the named defendants is insufficient to satisfy the second element. See Pronin v. Johnson, 628 F. App'x 160, 164 (4th Cir. 2015) (emphasizing that "a valid claim for a violation of equal protection . . . must allege the requisite discriminatory intent with more than mere conclusory assertions").

For these reasons, the defendants' motions will be granted as to the equal protection claim asserted in Count II.

## B.    Claims under State Law

In light of the court's disposition of the federal claims asserted in Counts I and II of the amended complaint, the court declines to exercise supplemental jurisdiction over the state law claims asserted in Counts III through VII and will dismiss those claims without prejudice. See 28 U.S.C. § 1367(c)(3) (authorizing a district court to decline to exercise supplemental jurisdiction when it "has dismissed all claims over which it has original jurisdiction"); see also Ryu v. Whitten, 684 F. App'x 308, 311-12 (4th Cir. 2017) ("[B]ecause we affirm the grant of summary judgment on all of Ryu's federal claims, no reason exists to exercise supplemental

jurisdiction over his pendant state law claims; rather they should be dismissed without prejudice.").

## V.     Conclusion

For the reasons stated, the motion to dismiss filed by Dr. Amonette, ECF No. 40, and the motion for summary judgment filed by Dr. Mathena and Dr. Fox, ECF No. 48, are **GRANTED** with respect Chamberlain's claims under 42 U.S.C. § 1983. The remaining claims under state law are **DISMISSED WITHOUT PREJUDICE**. An appropriate order will be entered.

Entered: March 30, 2022

Michael F. Urbanski
Chief U.S. District Judge
2022.03.30 11:21:58
-04'00'

Michael F. Urbanski
Chief United States District Judge

23